IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

UNITED STATES OF AMERICA

V.                                                          Case No.  2:18-cr-18-KS-MTP-3

HOPE EVANGULANE THOMLEY,
HOWARD RANDALL THOMLEY,
**GLENN DOYLE BEACH, JR.**, and
GREGORY GRAFTON PARKER.

### DEFENDANT BEACH'S MOTION TO DISMISS THE INDICTMENT OR, IN THE ALTERNATIVE, STRIKE MULTIPLICITOUS COUNTS

NOW COMES the Separate Defendant, Glenn Doyle Beach, Jr. ("Defendant Beach"), through undersigned counsel, and respectfully moves this Honorable Court pursuant to Fed. R. Crim. P. 12(b)(3)(B)(iii) to dismiss the indictment against him because it fails to state any facts with specificity and Fed. R. Crim. P. 12(b)(3)(B)(v) because it fails to state an offense for which Defendant Beach can be prosecuted as a matter of law. Defendant Beach will assume solely for the purposes of this Motion that the allegations in the indictment are true, as required for the Court to evaluate a motion to dismiss, although he does not admit to, and in fact contests, the Government's allegations and theory of criminality.

In the alternative, Defendant Beach moves this Court to require the Government to strike multiplicitous counts pursuant to Fed. R. Crim. P. 12(b)(3)(B)(ii).  The indictment charges Defendant Beach with four (4) conspiracy counts: Count 1, Count 14, Count 24 and Count 25.  These Counts contain the exact same singular scheme with the same alleged co-conspirators[1] and an overlap in time, objective, and manner and means.  The Court should require the Government to elect which Counts it would like to proceed to trial on and dismiss the remaining counts.

Finally, the Indictment fails to provide factual particularity sufficient to enable the defense to adequately prepare for trial, avoid prejudicial surprise and prevent double jeopardy. If the Court does not

---

[1] Count Twenty-Five states that Defendant Beach has co-conspirators, however none are specified within the Count and it is unclear as to whom the indictment alleges is a member of the conspiracy.

grant the dismissal of the indictment, Defendant Beach moves this Court to require the Government to file a Bill of Particulars pursuant to Fed. R. Crim. P. 7(f). In support thereof, counsel states as follows:

## **BACKGROUND**

The indictment at issue in this case (the "Indictment") was filed under seal on May 15, 2018. [Dkt. #3]. Defendant Beach was arrested and arraigned on June 25, 2018. *See* Docket Minute Entry, dated June 25, 2018. Defendant Beach entered a not guilty plea to each count of the Indictment. *Id.*

The Indictment charges Defendant Beach with nine (9) counts, including four counts of conspiracy.[2] Although charged with numerous counts, the Indictment fails to identify any criminal conduct that can be attributed to Defendant Beach or any unlawful behavior for which Defendant Beach could be criminally prosecuted as a matter of law. The Indictment also fails to establish a sufficient nexus between Defendant Beach and the other defendants to establish that Defendant Beach *knowingly* participated in a conspiracy and that Defendant Beach *knew, or had any knowledge of*, the criminal conduct that his alleged co-conspirators participated in. For these reasons, the Indictment against Defendant Beach should be dismissed in its entirety. Each individual count is discussed in greater detail below.

In the alternative, the Court should require that the Government elect which Counts it would like to proceed to trial on and dismiss the remaining counts as multiplicitous. Counts 1, 14, 24 and 25 charge Defendant Beach with separate conspiracies, however the underlying factual allegations comprise a single scheme. The Government introduces this singular scheme in the first paragraph of the Indictment: "As detailed herein, approximately between 2012 and 2015, [DEFENDANTS] conspired to engage in a scheme

---

[2] Count 1 charges Defendant Beach with conspiracy to commit wire fraud (18 USC §1343) and healthcare fraud (18 USC §1347) all in violation of 18 USC §1349. Counts 4, 5, and 6 charge Defendant Beach with single counts of healthcare fraud pursuant to 18 USC §§1347, 2. Count 14 charges Defendant Beach with conspiracy to commit violations of the federal Anti-kickback Statute ("AKS") pursuant to 42 USC §1320a-7b(b)(1)(A) and §1320a-7b(b)(1)(b), 42 USC §1320a-7b(b)(2)(A) and §1320a-7b(b)(2)(b), all in violation of 18 USC §371. Count 15 charges Defendant Beach with a single kickback in violation of 42 USC §1320a-7b(b). Count 24 charges Defendant Beach with conspiracy to commit money laundering pursuant to 18 USC §1956, 18 USC §1957, all in violation of 18 USC §1956(h). Count 25 charges Defendant Beach with conspiracy to commit money laundering pursuant to 18 USC §1956, 18 USC §1957, all in violation of 18 USC §1956(h). Count 28 charges Defendant Beach with a single count of money laundering in violation of 18 USC §1956(a)(1)(B)(i) and 2. *Id.*

to defraud health care insurance companies of more than $200 million by fraudulently formulating, marketing, prescribing, and billing for compounded medications produced and dispensed by pharmacies located in the Southern District of Mississippi.  Additionally, during the same time frame, the defendants also conspired to and engaged in a scheme to pay and receive health care kickbacks and bribes as well as to launder monetary instruments for the purpose of concealing the fraudulently obtained proceeds." [Dkt. #3 at ¶1].  Every count within the Indictment re-alleges and incorporates this introductory paragraph because, as the Indictment makes clear, the Government's theory of the case includes **one** over-broad and over-reaching conspiracy, not several individual conspiracies as the Indictment incorrectly charges.

Although Defendant Beach is charged with four different conspiracy counts, the Indictment's factual allegations suggest a single agreement with multiple objects, which should have been charged as a single conspiracy.  *See, e.g.*, *United States v. Sherrod*, 964 F.2d 1501, 1513 (5th Cir. 1992) ("It is well established that a single conspiracy may have several objectives."); United States v. Elam, 678 F.2d 1234, 1250 (5th Cir.1982).  The four counts (1) include the same exact allegedly false or  fraudulent claims submitted to healthcare programs for reimbursement; (2) contain overlapping periods of time; (3) were allegedly committed in the same location ("the Southern District of Mississippi, and elsewhere"); (4) include common co-conspirators; and (5) concern a common scheme to defraud various health care programs using illicit kickbacks and bribes and then laundering the proceeds through various "shell" companies. These counts are clearly multiplicitous and are the perfect example of the Government over-charging its case.[3] The Court should order the Government to elect which counts it would like to proceed upon and the multiplicitous counts should be struck.

---

[3] The Indictment itself violates Department of Justice policy as stated in the United States Attorney's Office Manual Section 215 regarding charging instruments: "In order to promote the fair administration of justice, as well as the perception of justice, all United States Attorneys should charge in indictments and informations **as few separate counts** as are reasonably necessary to prosecute fully and successfully and to provide for a fair sentence on conviction. To the extent reasonable, indictments and informations should be limited to fifteen counts or less, so long as such a limitation does not jeopardize successful prosecution or preclude a sentence appropriate to the nature and extent of the offenses involved."

Finally, if the Court does not dismiss the Indictment in its entirety, Defendant Beach moves the Court to require the Government to file a Bill of Particulars with specific allegations sufficient enough for Defendant Beach to adequately prepare for trial, avoid prejudicial surprise, and prevent double jeopardy.

## ARGUMENT STANDARD

### *Dismissal of the Indictment for Failure to State an Offense*

Fed. R. Crim. P. 7(c)(1) requires the government to begin every prosecution with "a plain, concise and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). When that does not occur, Fed. R. Crim. R. 12(b)(3) allows the following defenses, objections, and requests to be raised by pretrial motion if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits:  (B)  a defect in the indictment or information, including: (iii) lack of specificity; or (v) failure to state an offense.  Fed. R. Crim. R. 12(b)(3)(B)(iii), (v). "The starting place for any determination of whether the charged conduct [is] proscribed by [a criminal] statute is a reading of the language of the charging instrument and the statute itself." *United States v. Ratcliff*, 488 F.3d 639, 643 (5th Cir. 2007); *United States v. White,* 258 F.3d 374, 381 (5th Cir. 2001) (quoting *United States v. Morales-Rosales,* 838 F.2d 1359, 1361 (5th Cir.1988)). "[T]he propriety of granting a motion to dismiss an indictment ... by pretrial motion is by-and-large contingent upon whether the infirmity in the prosecution is essentially one of law or involves determinations of fact. If a question of law is involved, then consideration of the motion is generally proper." *United States v. Fontenot*, 665 F.3d 640, 644 (5th Cir. 2011) (quoting *United States v. Flores*, 404 F.3d 320, 324 (5th Cir. 2005) (internal quotation marks and citations omitted). The Court must "take the allegations of the indictment as true ... to determine whether an offense has been stated." *Id*.  Then, the court questions whether the allegations are sufficient to establish a violation of the charged offense. *United States v. Sampson,* 371 U.S. 75, 78–79 (1962).  The Indictment in this matter is defective as it fails to state any charges with specificity and fails to state an offense for which Defendant Beach can be criminally prosecuted.

***Dismissal of Counts as Multiplicitous***

Under Rule 12 of the Federal Rules of Criminal Procedure, a defendant can file a pre-trial motion raising defects in an indictment, including the defect of "charging the same offense in more than one count (multiplicity)." Fed. Crim. R. Crim. Pro. 12(b)(3)(B)(ii).  A court has the ability to remedy the defect of a multiplicitous indictment at the pre-trial stage by ordering the government to "elect" among the multiplicitous counts and then dismiss and strike the unelected counts.  *United States v. Smith*, 591 F.2d 1105, 1108 (5th Cir. 1979); *accord* 1A CHARLES ALAN WRIGHT & ANDREW D. LEIPOLD, FEDERAL PRACTICE AND PROCEDURE § 145, at 99-100 (4th ed. 2008); *see also United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218, 225 (1952).

A multiplicitous indictment raises two dangers.  "The principal danger raised by a multiplicitous indictment is the possibility that the defendant will receive more than one sentence for a single offense," *Hearod*, 499 F.2d at 1005, which would violate the Double Jeopardy Clause, *United States v. Colunga*, 786 F.2d 655, 657 (5th Cir. 1986).  "The second hazard is that the repeated assertion of the details of a singular course of conduct in multiple counts will prejudice the defendant and confuse the jury by suggesting that not one but several crimes have been committed."  *Hearod*, 499 F.2d at 1005.  Because the defect of multiplicity is derived from the Double Jeopardy Clause, courts are required to look to the operative test announced in *Blockburger v. United States*, 284 U.S. 299, 204 (1932), which asks "whether each provision requires proof of a fact that the other does not," *Albernaz v. United States*, 450 U.S. 333, 337 (1981).  In making this determination, the court must look not just at the elements of the statutes but also at how the offenses where charged in the indictment (and ultimately proven, if applicable).  *See, e.g.*, *United States v. Ogba*, 526 F.3d 214, 234 (5th Cir. 2008). Pursuant to this test and Fifth Circuit caselaw, in the event that the Indictment is not dismissed in its entirety, this Court should compel the government to make an election among the various multiplicitous conspiracy counts, and then dismiss and strike the unelected counts.

***Bill of Particulars***

Rule 7(f) grants courts wide discretion to order a bill of particulars even where an indictment meets the minimum requirements set out in Rule 7(c) (defendant's right to know the "essential facts constituting

the offense charged") and guaranteed by the 5th and 6th Amendments to the United States Constitution (defendant's right to due process, notice, and indictment by grand jury). *See* Fed. R. Crim. P. 7(f) (in addition to the requirements above: "The court may direct the government to file a bill of particulars."). "[A] Bill of particulars has for its purpose informing a defendant of the nature of the charges against him so that he will have sufficient detail to prepare for this defense, to avoid or minimize the danger of surprise at trial, and to enable him to plead double jeopardy in the event of a subsequent prosecution for the same offense." *United States v. Murray,* 527 F.2d 401, 411 (5th Cir. 1976); *See also United States v. Mackey,* 551 F.2d 967, 970 (5th Cir. 1977); *United States v. Carlock,* 806 F.2d 535, 550 (5th Cir. 1986) ("The purpose of a bill of particulars is to minimize surprise by giving 'sufficient notice of a charge for its defense'"). A Bill of Particulars is necessary because the Indictment does not provide factual particularity sufficient to enable Defendant Beach to adequately prepare for trial, avoid prejudicial surprise, and prevent double jeopardy.

## A. COUNT 1

### 1. THERE IS AN INSUFFICIENT NEXUS BETWEEN BEACH AND ALLEGED CO-CONSPIRATORS TO ESTABLISH A CONSPIRACY

The Government's criminal investigation began at some point in late 2014. A year later, on January 21, 2016, the Government conducted multiple search warrants and raided the business of Advantage Pharmacy, LLC ("Advantage") among other businesses, which included offices and businesses of Defendant Beach. Subsequent to the January 2016 raid, the Government also seized assets of Defendant Beach and many other persons.[4]  The public record was silent for some time on this matter until July 25, 2017, when Jay Schaar and Jason May entered into plea agreements. Per the Government's theory, both Schaar and May are considered to be co-conspirators of the conspiracy alleged in the Indictment

---

[4] Interestingly, after the raid, the Government elected to seize assets from one Advantage majority owner (Joele Smith 27.5%) and not from the other (Todd Nace 27.5%) and have decided not to name either as co-conspirators in the alleged Conspiracy even though the two received over fifty percent (50%) of the profits, for which the Government has deemed in the Indictment to be illegal proceeds. This clearly demonstrates that an owner of Advantage could partake in the business and receive the financial benefits of the business without being involved in the alleged Conspiracy.

(hereinafter, the "Conspiracy"). There is not a single reference in any pleading by the Government that Defendant Beach ever had any contact with Schaar because, quite simply, there was never any contact between the two. Regarding Jason May, Defendant Beach, like May, was a 10% owner of Advantage and, thus, Defendant Beach -- though he vehemently denies the vague allegations in the Indictment -- did have contact with May, since they were both minority owners of a business.

Subsequent to Schaar and May entering into plea agreements, the Government then filed separate individual indictments against purported "co-conspirators" of the alleged Conspiracy. One such indictment was against Dr. Albert Diaz (Criminal Action No. 2:17cr131), who was the only named Defendant in the indictment, but alleged by the Government to be a part of the Conspiracy through his connections to Schaar. Dr. Diaz went to trial and was found guilty. Again, Defendant Beach had no involvement with Dr. Diaz or his trial. The second indictment was against Susan K. Perry (Criminal Action No. 2:17cr30). Like the Diaz case, the indictment only included Ms. Perry, but alleged that she was tied to the Conspiracy based upon the testimony of Schaar. Ms. Perry entered a plea on June 15, 2018, before this Court. Again, the Government chose to indict a "co-conspirator" of this alleged Conspiracy separately from the defendants named herein.

Contrary to the Diaz and Perry indictments, the Indictment at issue named four defendants: Beach, Parker, Hope Thomley and Howard Thomley. [Dkt. #3]. The Government attempted to assert factual allegations to connect the four named defendants with other unnamed co-conspirators, along with the cast of characters whom the Government has already convinced to plea or convicted at trial. However, the Government has failed to establish the necessary nexus between Defendant Beach and the alleged co-conspirators sufficient to warrant Defendant Beach as a co-conspirator in the Indictment.

Defendant David Parker ("Parker"), plead guilty before this Court. There is not a single connection between Defendant Beach and Parker alleged within the Indictment. The Indictment is also completely void of any allegations of contact, communication or interaction between Defendant Beach and defendant Randy Thomley. Rather, the Indictment focuses primarily on Defendant Beach's interaction with Jason May. The Government then weakly attempts to spatter ambiguous allegations that since Defendant Beach, as the

acting manager for Advantage, signed a lawful agreement with Total Marketing that was countersigned by Defendant Hope Thomley, Defendant Beach is somehow a co-conspirator with Ms. Thomley. The Indictment is wholly devoid of any specific allegations of criminal conduct connecting Defendant Beach and Defendant Hope Thomley, or any specific allegations that the agreement between them is illegal. The Indictment is replete with baseless, conclusory statements, fails to provide any factual reference as to purported illegality of the agreement, and, more importantly, fails to allege how Defendant Beach would know any checks he signed as a managing member were illegal acts. Furthermore, the Indictment does not allege a criminal act or any actual knowledge by Defendant Beach of the alleged conduct of the physicians, May or any other alleged co-conspirators referenced in the Indictment. Thus, the act of signing a lawful agreement (since the Indictment is void of any allegation of how the agreement is illegal), and signing checks pursuant to that agreement, without any demonstration by the Government of illegal activity *known* by Defendant Beach or knowledge of Defendant Beach that his actions were illegal, causes the Indictment to be void of the necessary element that Defendant Beach *knowingly* participated in any conspiracy or in the criminal allegations set forth in the Indictment.

Additionally, there are two physicians mentioned in the Indictment, Dr. Diaz and Dr. Brantley Nichols, both of whom did not have any connection with Defendant Beach. In fact, the Government charged both Dr. Diaz and Dr. Nichols separately. In both of those separate indictments, Defendant Beach is never even mentioned, as he had no role or contact with those physicians and was not aware of any of their alleged conduct.

The Court of Appeals for the Fifth Circuit recently set out a thorough analysis of the evidence necessary to establish a conspiracy in *United States v. Ganji,* 880 F.3d 760 (5th Cir. 2018):

> To support a conspiracy to commit health care fraud conviction under 18 USC §1349, the Government must prove beyond a reasonable doubt that: "(1) two or more persons made an agreement to commit health care fraud; (2) that the defendant knew the unlawful purpose of the agreement; and (3) that the defendant joined in the agreement . . . with the intent to further the unlawful purpose." *United States v. Eghobor*, 812 F.3d 352, 362 (5th Cir. 2015) (quoting *United States v. Grant*, 683 F.3d 639, 643 (5th Cir. 2012)). Agreements need not be spoken or formal, and the Government can use evidence of the conspirators' concerted actions to prove an agreement existed. *See Grant*, 683 F.3d at 643. However, an agreement is a necessary element of conspiracy, and as such, "the Government must prove [its

existence] beyond a reasonable doubt." *United States v. Arredondo-Morales*, 624 F.2d 681, 683 (5th Cir. 1980) (citing *Patterson v. New York*, 432 U.S. 197, 210 (1977) ("[T]he Due Process Clause requires the prosecution to prove beyond a reasonable doubt all of the elements included in the definition of the offense of which the defendant is charged."). The Government may establish any element through circumstantial evidence. See *United States v. Willett*, 751 F.3d 335, 339 (5th Cir. 2014). However, "[p]roof of an agreement to enter a conspiracy is not to be lightly inferred." *United States v. Johnson*, 439 F.2d 885, 888 (5th Cir. 1971). "Mere similarity of conduct among various persons and the fact that they have associated with or are related to each other" is insufficient to prove an agreement. *United States v. White*, 569 F.2d 263, 268 (5th Cir. 1978). *United States v. Ganji,* 880 F.3d 760 (5th Cir. 2018)

There is insufficient evidence alleged to charge Defendant Beach with conspiracy in the Indictment, let alone convict him of a crime. The Indictment does not assert that Defendant Beach entered into an agreement with anyone to violate the law or that he *knowingly* participated in any criminal act. As stated in *White*, Defendant Beach's mere association with other co-conspirators does not infer participation in the conspiracy. The Indictment fails to establish the necessary nexus between Defendant Beach and any of the co-conspirators sufficient to warrant Defendant Beach as a co-conspirator in the Indictment.

2. FORMULATING AND PRODUCING HIGH-YIELD COMPOUNDING MEDICATION IS NOT ILLEGAL

The Government coins the term "High-Yield Compounding Medication" and insinuates that there is something nefarious or unlawful about this term, however the Government fails to state any violation of law when it comes to the formulation and production of "High-Yield Compounding Medications." [Dkt. #3, at ¶50]. The Government states that co-conspirators "identified, promoted, and mass-produced formulations of compounded medications." *Id.* None of the activities that the Government describes within this statement are illegal. It is the responsibility of healthcare providers and drug manufacturers to identify and promote medications that are beneficial to patients and that provide improved quality of patient care. Compound medications, just like any other medically necessary prescription, cannot be treated any differently. In fact, compound medications have been found to have numerous medical benefits for patients, including the fact that compound medications are not addictive. Branvold A, Carvalho M: *Pain management therapy: The benefits of compounded transdermal pain medication*. J Gen Pract. 2014; 2: 188. Because of this important fact, the Government promotes the use of compound medications through federal

healthcare programs, such as TRICARE, in response to the national opioid epidemic and the growing number of veterans and active military who are addicted to Oxycodone, Vicodin, and other opiates. *See* https://tricare.mil/compounddrugs. The Government cannot now claim that the identification and promotion of these alternative medications, the same drugs that the Government identified and promoted to our veterans as an alternative to highly addictive drugs, is now illegal.

The Government then suggests that the co-conspirators submitted claims for "High-Yield Compounding Medications" to healthcare programs, including, TRICARE, which would reimburse at a particularly high rate. *Id.* Again, there is nothing illegal about submitting a prescription claim for a compound medication to a federal healthcare program, such as TRICARE. The Government's insinuation that the high reimbursement rate can somehow be attributed to the Defendants is disingenuous. Medical providers, including pharmacies, have absolutely no control over the reimbursement rates of prescription medications set by manufacturers and agreed upon by government healthcare programs. TRICARE, the program that offers pharmacy and medical benefits to active and retired duty personnel and their dependents, agreed to the reimbursement rates set by the ingredient manufactures for the compounded medications. Pharmacies, physicians, and other healthcare providers did not have any input into the reimbursement rates for which ingredients would be reimbursed by the government program.

Ironically, it appears that TRICARE did not follow its own regulations when setting the reimbursement rates for compounded medications. The United States Government Accountability Office ("GAO") reported to Congress in October 2014 on TRICARE's payment practices regarding compounded medications. *See* GAO-15-64: *Compounded Drugs: TRICARE's Payment Practices should be more Consistent with Regulations* (October 2014). The GAO concluded that, "TRICARE'S payment practices for certain compounded drugs under its pharmacy and medical benefit are inconsistent with TRICARE regulations and are typically more generous than Medicare or the Department of Veteran's Affairs." For example, Medicare did not allow for per ingredient adjusted whole price billing. The report found that, "Though compounded drugs represent a small share of TRICARE's overall drug costs, its costs for these drugs have risen significantly in recent years. Moreover, because most of these drugs contain bulk drug

substances generally not approved by FDA, TRICARE's practice of paying for them is inconsistent with its regulations and results in added costs for the program."[5] *Id.* Quite simply, if the Government did not like high reimbursement rates, the Government should have followed its own regulations and set reimbursement rates commensurate with the Medicare rates.  The Government cannot lay its own mistakes and violations of policy at the feet of Defendant Beach.

Next, the Government questions the "effectiveness" of the compound medications.  Compound medications were *promoted by government healthcare programs* starting in 2013 in response to the national epidemic of patient abuse of opioid pain pills.  Physicians responded to the national crisis by writing prescriptions for alternative non-addictive treatments, such as compounding drugs.  There is no dispute in the medical community that compounded medications can have significant benefits, especially to those who are experiencing immense pain but are susceptible to the issues of addiction, such as the large number of patients that define our military population.  Branvold A, Carvalho M (2014), Pain management therapy: The benefits of compounded transdermal pain medication. *J Gen Pract; 2: 188*. In addition to the "effectiveness" of compound medications, the Government intimates that the use of Ketamine in compound medications is illegal, however this is simply not true.  *Id.*  Ketamine is a prescription anesthetic that is federally regulated and functions as a dissociative anesthetic, a low-grade pain killer, and is used in compound medications for its minimal risk of addiction. August S. Bassani, PharmD, RPh Daniel Banov, RPh, MS (February 8, 2016), Evaluation of the Percutaneous Absorption of Ketamine HCl, Gabapentin, Clonidine HCl, and Baclofen, in Compounded Transdermal Pain Formulations, Using the Franz Finite Dose Model, *Pain Medicine*, Volume 17, Issue 2, 1, Pages 230–238.  The Government has not incorporated any statutory authority or caselaw to support its theory that the formulation and production of compound medications is illegal, because no such legal authority exists.  The medical research shows that compound medications can be extremely effective for patients and government health care programs, through their billing practices, support this medical assessment.

---

[5] The Court can take judicial notice of the GAO report pursuant to Federal Rules of Evidence, Rule 201.

Let's assume, *arguendo*, that the Government can prove that some compound medications were not effective and that the use of Ketamine was medically unnecessary in certain circumstances. The Indictment still fails to establish the violation of any law by Defendant Beach and fails to establish that Defendant Beach *knew or had knowledge* of any of the criminal conduct that his alleged co-conspirators allegedly participated in. Defendant Beach is not a medical doctor, he does not prescribe medications, and the Government has conceded that the, "Indictment contains no specific allegations of Defendant Beach's communications with prescribers." [Dkt. #85 at 11]. There is no factual allegation within the Indictment to support the Government's claim that Defendant Beach knew the prescribed medications were not medically necessary.

3. "TEST" OR "DUMMY" CLAIMS ARE NOT ILLEGAL

The Government states that "Beach and his co-conspirators instructed May and others to run "test" or "dummy" claims with healthcare benefit programs in order to determine how much healthcare benefit programs would reimburse for the formulas." [Dkt. #3 at ¶51]. The Government suggests that this practice is illegal, however, this practice was utilized legally throughout the medical industry. Physicians often ask pharmacies to verify whether a certain healthcare program will cover a specific ingredient within a formula in order to reduce patient cost. In fact, many Pharmacy Benefit Managers ("PBMs") utilize test claims as corroborated by the following excerpt from a specialty pharmacy journal:

> Many pharmacy management systems allow for the submission of a "test claim." Test claims represent transactions used to confirm patient eligibility and the existence of any coverage restrictions and/or requirements (ie, prior authorization, step therapy, etc). While test claims are useful, control procedures should be in place to minimize potential processing errors if not correctly reversed. Reporting considerations should also be in place during this work flow as the tracking of each transaction will not only be critical to ensure standard operating procedures are followed (ie, reversing trial claims), but will also be expected to support internal and external audits. Jim Maguire (October 10, 2012), Specialty Pharmacy Work Flow Operations: Technological Considerations Overview, *Specialty Pharmacy Times* (October 10, 2012).

RxAmerica, a subsidiary of CVS Caremark and well-known PBM, advertised the utilization of test claims for insurance claim submissions: "RxAmerica Submit "test" claims to RxAmerica using the following information: Test Information BIN: 610473 NABP: 9909989 Cardholder ID: 123456789

Member Code: 001 Help Desk: (800) 770-8014 Your vendor may call at (800) 770-8014 for information related to electronic set-up."[6] Again, the utilization of test claims is not illegal which is the reason that the Government cannot cite to any legal authority to supports is false presumption.

Certain compound ingredients may not be covered and reimbursed by various insurance programs. PBMs and government healthcare programs work closely together to create a drug formulary, a list of medications that will be covered by the government healthcare program.  An ingredient not on the formulary list will not be reimbursed by the healthcare program.  Formulary lists change all of the time and medications may be excluded for a number of reasons, a biosimilar prescription exists, there is a generic alternative, an over-the-counter becomes available, or as a result of a cost analysis.[7] The Government states that, if a medication was not reimbursed by a government healthcare program, Defendant Beach and his alleged co-conspirators would "vary the ingredients and provide the patient with a different High-Yield Compound Medication that was covered, and bill the substitute formula instead." [Dkt. #3 at ¶52]. Essentially, the Government is alleging that Defendant Beach and his alleged co-conspirators committed a crime by finding an alternate ingredient, with the same medical efficacy, that insurance companies would cover.  This type of conduct occurs every single day in the healthcare industry and it is perfectly legal which is why the Indictment is void of any cite by the Government to a single statute or case authority that states these actions are illegal.

Next, the Government alleges that Defendant Beach and his alleged co-conspirators mass-produced compound medications "prior to receiving prescriptions and having individuals' medical needs identified." [Dkt. #3, at ¶53].  The FDA allows "anticipatory compounding" or the compounding of certain medications in advance. Specifically, the FDA issued guidance pursuant to Section 503A of the Drug, Quality and

---

[6] Even the government, through CMS, had its own test claim software: "To assist participants to choose a Part D plan that minimized their out-of-pocket costs, CMS offered a web-based tool called Plan Finder, which allowed Medicare Part D beneficiaries to determine estimated prescription drug prices for each Medicare Part D plan that the beneficiary considered for enrollment." *CVS Subsidiary, RxAmerica, Reaches $5 Million Settlement with US for Allegedly Submitting False Pricing Relating to the Company's Medicare Part D Plan,* DOJ Press Release (October 15, 2012).

[7] There are entire websites created to assist patients in navigating formulary exclusions. *See* www.lowestmed.com.

Security Act (DQSA), stating that pharmacists can engage in "anticipatory compounding" for a (thirty) 30-day supply … **to fill valid prescriptions it has not yet received**." *Prescription Requirement Under Section 503A of the Federal Food, Drug, and Cosmetic Act, Guidance for Industry,* U.S. Department of Health and Human Services, Food and Drug Administration, Center for Drug Evaluation and Research, Office of Compliance, pg. 9-10, (December 2016). In contrast to the allegations within the Indictment, this pharmaceutical practice is perfectly legal and common within the compounding industry.

4.   MARKETING COMPOUND MEDICATIONS IS NOT ILLEGAL

In ¶54 of the Indictment, the Government states, "Advantage Pharmacy would not dispense and bill for High-Yield Compounded Medication without a prescription signed by an ***authorized prescriber***." [emphasis added].   *Id* at ¶54.   This sentence in the Indictment, alone, should be enough to warrant a dismissal of the Indictment against Defendant Beach.   The Indictment concedes that Advantage Pharmacy received a prescription from an authorized prescriber, a medical professional with a valid patient-physician relationship who possesses the authority to write a prescription for medication in the due course of the patient's treatment.   Advantage Pharmacy received the prescription from an authorized prescriber, pharmacy personnel called the patient to verify the prescription, and Jason May filled and dispensed the prescription to the patient pursuant to the prescription requirements as signed by the authorized prescriber. Defendant Beach was not involved in the physician's determination of medical necessity, was not involved in the filling and dispensing of the medical prescription submitted to Advantage Pharmacy by an authorized prescriber, and was not involved in the filing of the insurance claim.   As such, the Government does not and cannot claim that Defendant Beach submitted a false claim, caused the submission of a false, or *knew or should have known* that the claim was false or fraudulent.

The Indictment continues to make conclusory assertions that certain actions are illegal without any supportive legal authority, because the acts are, in fact, perfectly legal.   The Indictment insinuates that the use of pre-printed prescription pads is illegal without the benefit of any statutory authority. [3, pg. 11, ¶55]. The Mississippi pharmacy regulations do not disallow the use of a pre-printed prescription, as long as the pre-printed prescription form does not contain any controlled substances. Miss. Code Ann. § 73-21-115;

Mississippi Pharmacy Practice Regulations, Title 30, Part 3001, Article X11. The prescription pads provided by the Government in discovery do not contain any controlled substances and, as such, are perfectly legal which is the reason that the Government does not allege any facts or legal authority to support this false assertion. Second, the "unlawful" handwriting on the prescriptions alleged by the Indictment [3, pg. 11, ¶56], was a mechanism put in place by Advantage Pharmacy to allow physicians to change or edit formulas to the specific needs of the patient if the more common formulas on the prescription pad did not meet the patient's specific needs. The purpose of compounded pharmaceuticals is to allow a prescriber to order or create a medication that responds to the patient's specific needs.

The Indictment also alleges the defendants and co-conspirators were paid "kickbacks – a percentage of the revenue for the prescriptions they obtained." [Dkt. #3 at ¶57]. The Indictment is unclear as to what form of revenue it alleges is an unlawful kickback. Defendant Beach received revenue pursuant to his ownership interest in Advantage Pharmacy, which is perfectly legal. The Indictment then states that, "the defendants devised a number of bribery and kickback schemes to provide remuneration to marketers and prescribers who prescribed High Yield Compound Medications and to the beneficiaries who accepted it." *Id* at ¶58. Once again, the Indictment fails to state any specific allegations regarding the "number of bribery and kickback schemes." The Indictment makes an overly broad and ill-defined allegation and the Defendants are left guessing what the Indictment is, in fact, alleging. *See supra* at 4-5. Nowhere in the Indictment does it state that Defendant Beach had any direct contact with marketers, prescribers, or beneficiaries or what illegal act Defendant Beach actually *knowingly* committed. The Government simply includes conclusory statements, not factual allegations, grouping all defendants and without providing any specificity as to what illegal actions Defendant Beach actually allegedly committed. *Id.* Moreover, the Government conceded that the "Indictment contains no specific allegations of Defendant Beach's communications with prescribers." [Dkt. #85 at ¶ 11]. The Indictment is void of any pharmacy practice or marketing practice that constitutes an illegal activity upon which Defendant Beach can be criminally prosecuted.

5.   PRESCRIBING HIGH YIELD COMPOUNDED MEDICATION IS NOT ILLEGAL

Defendant Beach's name is notably absent from ¶59 - ¶62 of the Indictment because, the Government has no evidence that Defendant Beach knew physicians were prescribing compound medications "regardless of whether it was medically necessary for the individual patient, often time, in exchange for kickbacks and bribes and without examining the patients. [Dkt.#3 at ¶11]. The Indictment is devoid of any communications between Defendant Beach and physicians [Dkt. #85 at ¶ 11], it is devoid of any payments by Defendant Beach to physicians, and it is devoid of any evidence that Defendant Beach *knew, or should have known*, of these alleged illegal practices. The Indictment fails to state an illegal action upon which Defendant Beach can be criminally prosecuted.

6.   BILLING FOR HIGH YIELD COMPOUNDED MEDICATIONS IS NOT ILLEGAL

¶63 of the Indictment states, that "Advantage Pharmacy's billing practices were designed to exploit and defraud healthcare benefit programs." Again, the Indictment fails to identify what policies and billing practices were designed to defraud healthcare benefit programs, which healthcare programs were defrauded, and who actually implemented these alleged practices. The Indictment fails to state a crime for which Defendant Beach can be prosecuted.

The Indictment then alleges that the Defendants and co-conspirators "devised a way for Advantage Pharmacy to waive and reduce the copayments for the beneficiaries, including TRICARE beneficiaries, while making it appear to healthcare benefit programs and PBMs that the copayments were collected." [3, ¶64]. It would be helpful to the Court and the Defendants if the Indictment explained the "way" the Defendants and co-conspirators waived and reduced payments for beneficiaries and how that amounts to a criminal act, yet the Indictment again fails to cite any specific facts or supportive authority. The Indictment suggests that the "co-payment scheme" was devised because "collecting full co-payments from patients would cause many of those patients to refuse the High Yield Compounded Medication." *Id.* Patient copayments for TRICARE beneficiaries ranged between $11 and $17. It is highly unlikely that a patient would be upset about this minimal copayment for a medication that the Government admits is extremely expensive and could cost the patient thousands of dollars.   The Government continues to rely upon

overbroad allegations that do not actually describe any criminal activity and, quite frankly, do not make any sense.  The Indictment fails to state even one instance or example for which a Tricare copayment was waived and more specifically any illegal action upon which Defendant Beach can be criminally prosecuted. Moreover, it is not the non-collection of a copay that is illegal, but rather the implementation of a scheme to waive Tricare copays and the actual waiver that is illegal, but again the Indictment is void of any such supportive facts.

7.  ADVANTAGE MEDICAL INFUSION: OWNING ANOTHER COMPANY IS NOT ILLEGAL

¶66 through ¶70 of the Indictment discuss the creation of Advantage Medical Infusion, a wholly separate legal entity from Advantage Pharmacy with independent licenses, independent pharmacy benefit manager contracts, and independent business operations.  The Indictment attempts to allege that it is a crime to own another business entity, however there is absolutely nothing illegal about owning multiple businesses.  The Indictment's allegations of "concealment" are also absurd.  The Defendants ongoing interests were disclosed in numerous locations, including pharmacy license applications, pharmacy benefit manager applications, other government licenses, and recertifications.  Nobody was trying to "hide" ongoing interests as there is nothing illegal about owning multiple businesses.  Even the Government cites the state of Mississippi being aware that Defendant Beach was no longer an owner. [Dkt.#3 at ¶69]. The Indictment states, when Defendant Beach separated from Advantage Medical Infusion, he forgot to remove himself as a co-signor on the corporate bank accounts, if this is true, there is no evidence or factual allegation to establish he ever wrote another check or engaged in any financial transactions on the Company's behalf.  Because there are none. The Indictment fails to state an illegal action upon which Defendant Beach can be criminally prosecuted.

8.  THE "SCOPE OF THE SCHEME" FAILS TO PROVIDE A SCOPE OR A SCHEME

The Indictment attempts to tie the whole scheme alleged in Count One together in ¶71 and ¶72 and attributes a $200 million loss to healthcare benefit programs for alleged fraudulent billing.  The Indictment makes over-broad and far reaching accusations without any specificity and fails to state a clear and concise statement of the essential facts.  In reviewing the sufficiency of an indictment, the courts will construe the

document as a whole to ascertain whether the foregoing requirements have been met. *United States v. Hand*, 497 F.2d 929, 934-35 (5th Cir. 1974), *cert. denied*, 424 U.S. 953 (1976). In *United States v. Ratcliff*, the United States Court of Appeals for the Fifth Circuit, reviewing and affirming the district court's dismissal of an indictment and applying Fed. R. Crim. P. 7(c)(1), provided  that "an indictment is sufficient if it "[1] alleges every element of the crime charged and [2] in such a way as to enable the accused to prepare his defense and [3] to allow the accused to invoke the double jeopardy clause in any subsequent proceeding." *United States v. Ratcliff*, 488 F.3d 639, 643 (5th Cir. 2005) (citing *United States v. Bieganowski*, 313 F.3d 264, 285 (5th Cir. 2002)). [8]

Count One does not fairly inform Defendant Beach of the charges against him and provides none of the critical factual allegations necessary to prescribe the offense allegedly committed.  The Indictment contains overly broad and ill-defined allegations and the Defendants are left guessing what the Indictment is, in fact, alleging.  In fact, the allegations presented would not even pass civil pleading standards pursuant to Fed. R. Civ. P. 12(b)(1) (*See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)), let alone the higher burden of a criminal standard where the defendant is entitled to know what illegal acts the government is alleging prior to attempting to take away his liberty. *See supra* 4-5.

Applying the Federal Rules and 5th Circuit caselaw to the standard for a motion to dismiss, Count 1 cannot survive the scrutiny.  First, it fails to state which healthcare benefit programs it is referencing – TRICARE, other federal health care payors, private insurance?  Second, Count 1 has yet to establish a fraudulent scheme, let alone one single crime that would justify federal criminal prosecution of Defendant Beach. The pharmacy operations for which the Indictment alleges are illegal, are, quite simply, not illegal. It is **not** illegal to: 1) formulate compound medications; 2) utilize "test" claims; 3) market compound medications; 4) prescribe compound medications; 5) bill for compound medications, or 6) own multiple companies.  The Indictment speaks in generalizations about "kickbacks," however the Indictment does not

---

[8] *See also United States v. Hamling*, 418 U.S. 87, 117 (1974) ("an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.").

specify what the alleged "kickback" activity entails.  Count 1 does not provide even one factual piece of information that Defendant Beach *knew*, or should have known, of the kickbacks, that Defendant Beach *knew*, or should have known, about medically unnecessary prescriptions, or that Defendant Beach *knew*, or should have known, about any false claim submitted to a healthcare program. Count 1, and the Indictment in its entirety, even assuming the minimal facts contained therein are true, fails to state any allegations with specificity and fails to state any offense for which Defendant Beach can be prosecuted as required by Fed. R. Crim. P. 12(b)(3)(B).  It also fails to provide "a plain, concise and definite written statement of the essential facts constituting the offense charged" pursuant to Fed. R. Crim. P. 7(c)(1). For these reasons, Count 1 fails.

### B.  COUNTS 4, 5, and 6

Counts 4, 5 and 6 [Dkt. #3 at ¶74] charge Defendant Beach with violating 18 USC §§1347, 2, however the Indictment fails to give any information as to why the Government deems these particular claims to be false or fraudulent and fails to provide any information as to how Defendant Beach *knew* that the filing of the claims were false or fraudulent.  As stated above, the allegations in Count One, re-alleged and incorporated by reference, do not specify any criminal violations and certainly do not constitute a "scheme to defraud."  Therefore, there is no basis upon which the Government can argue that the claims were filed under fraudulent representations and pretenses.  Moreover, the Indictment fails to name a victim with specificity.  The Indictment continuously states that claims were submitted to, "TRICARE and other healthcare benefit programs."  Were the claims discussed in Counts 4, 5 and 6 submitted to TRICARE or to a different healthcare program – the Indictment doesn't even answer the most basic questions of "who, what, when, and where." *See supra* 4-5. How can Defendant Beach defend these Counts when it is not even clear from the charging document what actions the Government deems unlawful?

An indictment should not keep the defendant guessing as to what crimes he committed. It must contain sufficient detail to adequately apprise the defendant of the nature of the charges against him and must contain "a plain, concise and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c). The Government must afford the defendant not only a document that

contains all of the elements of the offense, whether or not such elements appear in the statute, but one that is sufficiently descriptive to permit the defendant to prepare a defense, and to invoke the double jeopardy provision of the Fifth Amendment, if appropriate. *Hamling v. United States*, 418 U.S. 87, 117, *reh'd denied*, 419 U.S. 885 (1974); *Russell v. United States*, 369 U.S. 749, 763-72 (1962); *United States v. Hernandez*, 891 F.2d 521, 525 (5th Cir. 1989), *cert. denied*, 495 U.S. 909 (1990) (indictment for drug trafficking and firearm violations valid despite lack of specific statutory language because sufficient information provided to prepare double jeopardy defense). Counts 4, 5, and 6 fail because the counts do not sufficiently apprise Defendant Beach of the nature of the offense.

### C.  COUNT 14

Count 14 charges Defendant Beach with another conspiracy charge for alleged kickbacks in violation of 18 USC §371.  It is unclear from the reading of the Indictment whether these "kickbacks" are the same "kickbacks" alleged in Count 1.  It is also unclear whether the false claims the Indictment alleges were filed in Count 1 are the same false claims discussed in Count 14.  Furthermore, the Indictment repeatedly throws around the word "kickback," but this word is never defined and the actions that would constitute a kickback are never explained.  Although the Indictment is hard to decipher, it appears that the Government has many different theories on what a kickback could potentially be.  Unfortunately for the Government, there is not a single factual description of an example of one kickback and none of these theories can attribute criminal liability to Defendant Beach.

The Indictment states that Defendant Beach and Hope Thomley entered into a contract for marketing services. [Dkt. #3, ¶82(a)].[9]  The Indictment is silent as to why the Government deems the contract illegal. Commission payments to sales representatives are not *per se* illegal.  A thorough analysis needs to be given when considering whether a compensation structure potentially violates the federal Anti-Kickback Statute ("AKS").  Even in the absence of qualifying safe harbors, a number of factors must be

---

[9] The Indictment also fails to provide any analysis as to whether or not this arrangement is subject to any safer harbor provisions pursuant to 42 CFR § 1001.952.

evaluated prior to making a determination. *See* HHS-OIG Advisory Opinion 98-10.[10]   The Indictment makes it appear that the signing of a contract, in itself, is an illegal act.  This is simply not the standard and it creates yet another deficiency within the Indictment.

Assuming *arguendo* that such a contract for marketing services is illegal, the Indictment is still deficient as there is no explanation as to how Defendant Beach *knew* that the marketing contract provided to him by Hope Thomley was illegal. The AKS is an intent-based statute with two separate heightened intent elements.  The Government must prove that the defendant acted both "*knowingly and willfully,*" i.e. with intent to violate the law, and with intent to offer or pay remuneration in exchange for referrals. 42 USC §1320a-7b. The Fifth Circuit follows the "one purpose test" whereby only one purpose of the payment needs to be for the inducement of referrals, however both prongs of *"knowingly and willfully"* still need to be met to satisfy that purpose. *See U.S. v. Davis*, 132 F.3d 1092 (5th Cir. 1998); *U.S. v. Greber*, 760 F.2d 68, 69 (3rd Cir. 1985), cert. denied, 474 U.S. 988 (1985). The mere signing of a contract does not satisfy either intent element.  In fact, it defies reason why a person, knowing that something is illegal, would enter into a written contract establishing the exact activity that the person presumably would be trying to conceal. The statute is not violated unless the parties have the requisite intent to induce referrals.

Next, the Indictment states that kickbacks were paid to beneficiaries and physicians in the form of bribes (presumably cash bribes). *Id.*  Defendant Beach's name is notably absent from these allegations because Defendant Beach never paid any form of a cash bribe to a patient or a physician and Defendant Beach had absolutely no knowledge that the other defendants participated in the payment of cash kickbacks or bribes. The Indictment's silence on Defendant Beach's participation corroborates this fact.   The Government does allege that Defendant Beach paid "kickbacks to TRICARE beneficiaries in the form of

---

[10] We acknowledge that the myriad of guidance documents and advisory opinions that exist in the health care realm is complex and sometimes uncertain. We also acknowledge that federal courts typically give no deference to agency interpretations of criminal statutes. *See United States v. Apel*, 134 S. Ct. 1144, 1151 (2014). However, where guidance does exist and that guidance is *contrary* to the theory under which the government seeks to bring a *criminal* prosecution, the government cannot credibly claim a defendant could (or even *should*) have known that conduct consistent with the guidance was "something . . . that law forbids." *See United States v. Bay State Ambulance and hospital rental service, Inc.*, 874 F.2d at 33 (1st Cir. 1989).

covering their copayments in whole or in part." [Dkt. #3, at ¶82(c)].  In order for the payment of a patient co-payment to be illegal, the Government must establish that the waiver of the patient co-payment is 1) routine and 2) was not made for a patient who has a legitimate financial hardship. Health and Human Services – Office of Inspector General, *Special Fraud Alert*, Federal Register, December 19, 1994. Failure to establish the "routine" waiver of patient copayments is fatal to the Government's allegations.

The Indictment alleges that Defendant Beach provided a kickback in the form of a check to Total Marketing Services "some of which constituted remuneration" for referrals. [Dkt. #3, ¶64(f)].  The Indictment does not elaborate on what "some of which" means and, as such, does not identify the actual "kickback" amount.  The check appears to be a payment pursuant to the contract between Advantage Pharmacy and Total Marketing Services discussed above.  The Indictment fails to state how the contract violates any law or, if it did violate a law, the requisite intent needed to charge Defendant Beach, that Defendant Beach *knew* that this contractual payment was illegal.  Therefore, the payments made pursuant to that contractual relationship cannot be used as evidence against Defendant Beach. As such, Count 14 should be dismissed.

Finally, in the event that the Court decides not dismiss the Indictment in its entirety, Counts 1 and 14 appear to cover the exact same behavior, the same filed claims, the same time frame, and the same co-conspirators. In *Braverman v. United States*, 317 U.S. 49 (1942), the government obtained an indictment charging seven counts of conspiracy under the general conspiracy statute (now codified at 18 U.S.C. § 371). 317 U.S. at 50.  Each count charged a conspiracy to violate a separate provision of the Internal Revenue Code, but only one conspiratorial agreement was presented.  *Id.*  The Supreme Court held that the single agreement meant that the defendants could be charged and convicted of only one count of conspiracy, even though an object of the conspiracy was to violate separate and distinct provisions of the Internal Revenue Code. *Id.*

As the Fifth Circuit has reaffirmed, "*Braverman* remains a limitation on the Government's ability to fragment a single conspiracy under the general conspiracy statute."  *United States v. Rodriguez*, 612 F.2d 906, 912 n.16 (5th Cir. 1980) (*en banc*) (emphasis removed), *aff'd sub nom. Albernaz v. United States*, 450

U.S. 333 (1981).  In *United States v. Mori*, 444 F.2d 240 (5th Cir.), *cert. denied*, 404 U.S. 913 (1971), the Fifth Circuit expanded *Braverman* to a situation involving convictions under the general conspiracy statute and under a specific conspiracy statute, 21 U.S.C. § 174.[11]  *Mori* held "that under general principles of statutory construction, the specific nature of the importation conspiracy statute precluded additional conviction under the general conspiracy statute."  *Id.* (citing *Mori*, 444 F.2d at 245).  The Fifth Circuit originally explained this in *Mori* by explaining that, "Under general principles of statutory constructions, the catchall provisions of section 371 become subsumed under the particular, specific provisions of section 174."  444 F.2d at 245.

The holding of *Mori* is indisputably implicated here.  The indictment alleges a single conspiratorial agreement, [Dkt. #3, at ¶1] and yet, the government charges violations of two specific conspiracy statutes against Defendant Beach: Count 1 (alleging conspiracy under 18 U.S.C. § 1349), and Counts 24 and 25 (alleging conspiracy under 18 U.S.C. § 1956(h)).  The Government also charges conspiracy under the general conspiracy statute, 18 U.S.C. § 371, in Count 14.  *Mori* holds that "the catchall provisions of section 371 become subsumed under the particular provisions" of the specific conspiracy statutes.  444 F.2d at 245.[12]  As such, the Government should be precluded from charging under the general conspiracy statute, 18 U.S.C. § 371.

**D.  COUNT 15**

Count Fifteen charges Defendant Beach with an individual kickback in violation of 42 USC §1320a-7b(b).  This appears to be an individual count for the conduct identified in Count 14, payments made pursuant to the contract between Advantage Pharmacy and Total Marketing Services for marketing services of compound medications, but again the Indictment leaves the reader guessing. *See supra* 4-5.  The amount of the alleged kickback is $3,776,424.34, although the Indictment concedes that only some of this

---

[11] Section 174 "which proscribed conspiracy to import narcotics" has since been repealed.

[12] *See also United States v. Corral*, 578 F.2d 570, 572 (5th Cir. 1978) (following *Mori* and holding that the defendant could not be convicted under both the general conspiracy statute and a specific conspiracy statute); *United States v. Marotta*, 518 F.2d 681, 685 (9th Cir. 1975) (per curiam) (reading *Mori* to hold that "where specific conspiracy statutes have been enacted, Congress intended to replace and not supplement the general conspiracy statute").

payment constituted remuneration. *See* [Dkt. #3, at ¶82(f)].  The Indictment does not sufficiently place Defendant Beach on notice of the amount of the alleged kickback or the basis of the illegality or any knowledge of such a payment.  We also adopt the same arguments made above for Count Fourteen: 1) commission payments to sales representatives are not *per se* illegal; 2) the indictment never alleges that Defendant Beach *knew* that the marketing contract provided to him by Hope Thomley could potentially be illegal, and 3) the statute is not violated because Defendant Beach did have the requisite intent to induce referrals. *See supra* at 23-25.

### E.   COUNT 24

Count 24 charges Defendant Beach and other defendants with conspiracy to commit money laundering.[13]  As with the original conspiracy counts (Count One and Count Fourteen), the Indictment does not provide a sufficient nexus between Defendant Beach and the other defendants to establish a conspiracy. The Indictment is void of the necessary element that Defendant Beach knowingly participated in any conspiracy or in any of the criminal allegations set forth in the Indictment.

In addition, in order to prove a money laundering charge, the Government must prove that the defendant knew that the property came from some sort of criminal activity and that the property in fact constitutes the proceeds of a predicate offense. In *United States v. Gayton,* the Court held that "to support a conviction for money laundering under Sec. 1956(a)(1)(A)(i), the government must prove that (1) the defendant conducted or attempted to conduct a financial transaction, (2) which the defendant then ***knew involved the proceeds of unlawful activity***, (3) with the ***intent to promote or further unlawful activity***." *United States v. Gaytan*, 74 F.3d 545 (5th Cir. 1996) [emphasis added].   As discussed throughout this Motion, the Indictment's fatal flaw is that the Indictment fails to identify that Defendant Beach participated in or had knowledge of any criminal activity. Thus, there is no named specified unlawful activity within

---

[13] Specifically, Count 24 charges: a) money laundering, the specified unlawful activity being healthcare fraud (18 USC §1347), wire fraud (18 USC §1343), and unlawful kickbacks (42 USC §1320a-7b(b)), in violation of 18 USC§ 1956; money laundering, the specified unlawful activity being healthcare fraud (18 USC §1347), wire fraud (18 USC §1343), and unlawful kickbacks (42 USC §1320a-7b(b)), tax evasion (26 USC §7206) in violation of 18 USC §1956(a)(1)(A)(ii); c) money laundering in violation of healthcare fraud (18 USC §1347), wire fraud (18 USC §1343), and unlawful kickbacks (42 USC §1320a-7b(b)), in violation of 18 USC §§ 1956, 1957, all in violation of 18 USC § 1956(h).

the Indictment to substantiate any money laundering charges. Without any specified unlawful activity within the Indictment, this Count should be dismissed.

Furthermore, the Count is devoid of basic allegations that would substantiate a criminal act such as "who, what, and when?" *See supra* at 4-5. One of the objects of the conspiracy is described as "filing tax returns containing materially false statements in order to falsely claim deductions and underreport taxable income." [Dkt. #3 at 103(b)]. Yet, the manner and means do not mention who filed tax returns or on behalf of which entity, what taxable year the tax returns were filed, or what the fraudulent representations were on the supposedly fraudulent tax returns. The government eludes to "shell companies" [Dkt. #3 at 112], however, the government never defines what a shell company is, never explains which companies they delineate as "shell companies," never identifies the owners of these mysterious companies, and, most importantly, never states why the use of such a company is illegal. In fact, there are a variety of reasons why a company would legally be formed to accept proceeds for other business opportunities, including basic accounting principles and tax implications.

Furthermore, the Government's allegations that Defendant Beach "concealed said proceeds" [Dkt. #3 at §104] is completely meritless. The Indictment itself states that Defendant Beach "management and retained control" over bank accounts and filed his ownership interests with the Mississippi Secretary of State. [Dkt. #3 at ¶69]. The Government have it both ways and now claim that Defendant Beach "concealed" any such proceeds. Again, the Indictment lacks any substance as required by Fed. R. Crim. P. 7 and 12, but appears to be a convoluted series of overlapping, meritless and absurd accusations.

## F. COUNT 25

Count 25 charges Defendant Beach with yet another money laundering conspiracy account, although this Count does not provide the reader with any indication of who these co-conspirators may be. As such, we adopt our previous argument that the Indictment does not provide a sufficient nexus between Defendant Beach and the other defendants to establish a conspiracy. *See supra* at 10. Much like, Count 24, the Indictment is devoid of any specified unlawful activity committed by Defendant Beach to substantiate a money laundering charge.

Moreover, the objectives of Count 24 and Count 25 appear to cover the exact same behavior and Defendant Beach cannot be charged twice under the same conspiracy statute for a single agreement with multiple objects. The Indictment charges identical behavior in Counts 24 and 25 which involve the proceeds of a singular, common scheme. The purpose of the conspiracy is identical, "It was a purpose of the conspiracy to conduct wire transfer and issue and deposit checks representing the proceeds of health care fraud, wire fraud, and pay and receive healthcare kickbacks, to conceal said proceeds and obscure their nature, location, source, ownership, and control." [Dkt.#3 at ¶¶104, 116].

The Fifth Circuit has adopted five factors when determining whether alleged conspirators entered into a single agreement or multiple agreements: (1) time, (2) persons acting as conspirators, (3) the statutory offenses charged in the indictments, (4) the overt acts charged by the government or any other description of the offense charged which indicates the nature and scope of the activity which the government sought to punish in each case, and (5) places where the events alleged as part of the conspiracy took place. *See United States v. Marable,* 578 F.2d 151 (5th Cir.1978); *United States v. Deshaw*, 974 F.2d 667, 673-74 (5th Cir. 1992); *United States v. Richerson*, 833 F.2d 1147, 1153 (5th Cir. 1987). Applying the five factors to the instant case, it appears to satisfy the test for a single conspiracy.

A review of the Indictment reveals that the time frame overlaps (December 2013 to January 2016 in Count 24 and May 2013 to January 2016 in County Twenty-Five). Although Count 25 does not name conspirators, it is abundantly clear that the specified unlawful activity upon which the money laundering charge is based is the same conduct as described throughout the Indictment, most specifically in Counts 1 and 14, amongst the same co-conspirators. The statutory offenses charged are the same. The manner and means describe the same activity, "The defendant and his co-conspirators direct funds earned by Advantage Medical Pharmacy and Advantage Medical Infusion and derived from health care, wire fraud, and paying and receiving healthcare kickbacks…" [Dkt. #3, ¶¶108, 119]; The defendant and his co-conspirators used accounts under their control to "conceal and disguise, the nature location, source, ownership, and control of proceeds [Dkt. #3, ¶¶97, 121]. The wording is identical because the proceeds are allegedly derived from the same exact scheme, conducted by the same coconspirators, within the same or similar time frame. The

26

only difference between the two Counts is that the proceeds were directed to different bank accounts and/or entities, however it is the exact same crime.  As a result, if the Court decides not to dismiss the Indictment in its entirety, this Court should compel the Government to make an election among Counts 24 and 25, and then dismiss the unelected count.

### G.  COUNT 28

Count 28 charges Defendant Beach with a single money laundering violation,[14] specifically the issuance "of check #1073 from an account at Regions Bank ending in #8585 in the name of TLC RX to an account at Wells Fargo Bank ending in #6960 in the name of IPMS for $606,499.81." [Dkt. #3 at §128]. Again, there is no specified unlawful activity identified within the Indictment to substantiate a money laundering charge.  The Indictment is silent as to Defendant Beach's knowledge that the money came from some sort of criminal activity and that the money in fact constitutes the proceeds of a predicate offense. *See United States v. Gaytan*, 74 F.3d 545 (5th Cir. 1996). The Count fails to describe the roles of the two entities and what the nature of the transaction is between the two companies.  Payments from one company to another occur daily in the business world and do not constitute a violation of the law.  For these reasons, Count 28 should be dismissed.

### CONCLUSION

The Indictment fails to provide a plain, concise and definite written statement of the essential facts constituting the offense charged as required by Fed. R. Crim. P. 7(c)(1). Though long on accusatory rhetoric and unjust inferences, the actual charges within the Indictment provide none of the specificity the Constitution demands to initiate a criminal case and do not come close to properly pleading the criminal charges the government seeks to prosecute.  The Indictment in this case, even assuming the minimal facts contained therein are true, is devoid of specificity and fails to state an offense for which Defendant Beach can be prosecuted as required by Fed. R. Crim. R. 12(b)(3)(B)(iii) and (v). We respectfully request that the Court dismiss the Indictment in its entirety based upon these fatal flaws.  In the alternative, we request that

---

[14] The specified unlawful activity being healthcare fraud (18 USC §1347), wire fraud (18 USC §1343), and unlawful kickbacks (42 USC § 1320a-7b(b)), in violation of 18 USC §§ 1956(a)(1)(B)(i) and (2).

the Court dismiss the multiplicitous counts.  Specifically, this Court should order the Government to make an election among the two counts alleging violations of 18 U.S.C. § 1956(h) (Counts 24 and 25).  In addition, the specific conspiracy counts alleging violations of 18 U.S.C. § 1349 and 18 U.S.C. § 1956(h) (Counts 1, 24 and 25) preclude the government from charging conspiracy under the general conspiracy statute, 18 U.S.C. § 371 (Count 14).  Finally, if the Court decides against dismissing the Indictment, we respectfully request that the Court order the Government to file a Bill of Particulars to provide factual particularity sufficient to enable Defendant Beach to adequately prepare for trial, avoid prejudicial surprise and prevent double jeopardy.

This the 14th day of September, 2018.

Respectfully Submitted,

**GLENN DOYLE BEACH, JR.**


*/s/ Arthur F. Jernigan, Jr.*
Arthur F. Jernigan, Jr. (MSB #3092)
JERNIGAN, COPELAND, ATTORNEYS, PLLC
587 Highland Colony Parkway (39157)
Post Office Box 2598
Ridgeland, MS 39158-2598
Phone: (601) 427-0048
Fax: (601) 427-0051
Email: ajernigan@jcalawfirm.com

Brian E. Dickerson, Esq.
*Admitted Pro Hac Vice*
FISHERBROYLES, LLP
2390 Tamiami Trail North
Suite 100
Naples, Florida 34103
Phone: (202) 570-0248
Fax: (239) 236-1360
Email: brian.dickerson@fisherbroyles.com
***Counsel for Defendant Glenn Doyle Beach, Jr.***

## CERTIFICATE OF SERVICE

I, Arthur F. Jernigan, Jr., one of the attorneys for Defendant Glenn Doyle Beach, Jr., do hereby certify that I have, this day, filed the foregoing with the Clerk of Court via the CM/ECF system, which has caused a true and correct copy to be served on all counsel of record.

SO CERTIFIED, this the 14th day of September, 2018.

*/s/Arthur F. Jernigan, Jr.*
Arthur F. Jernigan, Jr.